UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,


                              Plaintiff,

                                                    <u>DECISION AND ORDER</u>

                                                    03-CR-6037L


              v.

LOUIS V. ASANDROV,


                              Defendant.

_____


        Defendant, Louis V. Asandrov ("Asandrov"), initially was indicted on February 25, 2003 and

charged with several counts of perjury pursuant to 18 U.S.C. § 1623.  The charges related to

Asandrov's testimony as a defense witness in a criminal trial entitled: *United States v. Samuel J.*

*Miceli and Donna M. Miceli,* 98-CR-6024, ("Miceli trial"), which was tried to a jury in February,

2000, before United States District Judge Charles J. Siragusa.[1]  Asandrov, a lawyer, had represented

Donna Miceli in proceedings before the Internal Revenue Service ("IRS") and before the United

States Tax Court.

        Asandrov filed motions to dismiss the indictment and during proceedings on those motions,

a series of superseding indictments followed.  Finally, on December 4, 2003, a second superseding

---

[1]Both of the Micelis were convicted after trial.  Samuel J. Miceli was sentenced to 97 months for his conviction of bankruptcy fraud.  Donna M. Miceli was convicted of making false statements and submitting false information to an Internal Revenue Service Officer and was sentenced principally to a term of 30 months.

indictment was filed charging Asandrov, in three counts, with perjury relating to his testimony at the Miceli trial. Originally, there were several specifications in each of the three counts but many were dismissed after extensive proceedings on defendant's motions to dismiss before United States Magistrate Judge Jonathan W. Feldman and before this Court.  What remained after resolution of the motions was a single specification in each of the three perjury counts.

Count I, at specification 8(a), charged Asandrov with testifying falsely at the Miceli trial, on or about February 15 and February 16, 2000, with respect to a material matter as follows:

> Q:  Did Mr. Terrigino ask any further questions after you told him that you would provide that affidavit?
>
> A:  No.
>
> Q:  Did he ask any questions directly to Donna Miceli about her assets?
>
> A:  No.
>
> Q:  At anytime during the interviews, did he ask her about her assets?
>
> A:  No.

Count II, at specification 13(d), charged Asandrov with testifying falsely on the same dates at the Miceli trial with respect to a material matter as follows:

> Q:  And you did not review the affidavit with Mrs. Miceli at any time prior to the affidavit, the Teresa Miceli affidavit, being filed with Fred Terrigino?
>
> A:  Right I did not review it with Donna Miceli.
>
> Q:  And you did not have any discussions with Mrs. Miceli regarding that affidavit?
>
> A:  That's correct.

Count III, at specification 18(a), charged Asandrov with testifying falsely on February 16, 2000, with respect to a material matter as follows:

> Q:  Mr. Asandrov, didn't you state to Jim Donovan on May 13, 1998, Jim Donovan an agent with Internal Revenue Service, didn't you state to him on May 13, 1998, which is about three years after the affidavit was submitted, didn't you state you had reviewed Teresa Miceli's affidavit with Donna M. Miceli; didn't you state that?
>
> A:  No, I did not.

The case was tried to the Court, without a jury, over seven days, commencing August 23, 2005.  I received submissions from the parties after the trial.  I have reviewed all of the exhibits submitted by the parties and a transcript of the trial has been prepared for my use.

I find that the Government has failed to carry its burden of proof beyond a reasonable doubt on all three counts and, therefore, find the defendant Louis V. Asandrov **NOT GUILTY** on all counts.  This Decision and Order constitutes the Court's specific findings of fact, pursuant to Rule 23(c), FED. R. CRIM. P.

## DISCUSSION

The statute, 18 U.S.C. § 1623, makes it a crime to knowingly make a false material declaration under oath in any proceeding before a court of the United States.  The elements are straightforward and, in this case, several are not disputed. "In order to obtain a conviction for perjury in violation of 18 U.S.C. § 1623, the government must prove that the defendant:  (1) knowingly made (2) a materially false declaration (3) under oath (4) in a proceeding before or ancillary to any court of the United States." *United States v. Lee*, 359 F.3d 412, 416 (6th Cir. 2004) (citing *United*

States v. McKenna, 327 F.3d 830, 838 (9th Cir. 2003)); *see also United States v. Wilkinson*, 137 F.3d 214, 224 (4th Cir.), *cert. denied*, 525 U.S. 873 (1998).

It is not disputed, and I so find, that Asandrov was under oath when the declarations at issue were made and that they were made before a court of the United States. I further find, beyond a reasonable doubt, that the statements at issue were "material." They are related to material matters being considered by the jury in the Miceli trial. The statements related directly to the charges against Donna Miceli, that she submitted false information to the Internal Revenue Service.

The principal element at issue is whether Asandrov knowingly gave false answers to the questions posed to him at the Miceli trial when he testified as a defense witness. The test for whether a defendant knowingly gave false testimony is an objective one. The factfinder "should determine whether the question–as the declarant must have understood it, giving it a reasonable reading–was falsely answered." *United States v. Lighte*, 782 F.2d 367, 372 (2d Cir. 1986).

"[A]n answer is knowingly false 'only if it was untrue when made and known to be untrue by the individual making it ... .'" *Id.* at 373 (quoting *United States v. Williams*, 552 F.2d 226, 229 (8th Cir. 1977)).

> In determining the meaning a declarant gives to a question, a jury need not examine isolated segments of the question and answer exchange, but may view it within the context of the entire line of questioning. The jury may also consider extrinsic evidence that demonstrates how a declarant interpreted a question. Although probing a declarant's intent poses difficulties, circumstantial evidence, including proof of a motive to falsify, often may serve to convince a reasonable juror beyond a reasonable doubt of a witness' criminal intent.

*Id.* (citations omitted).

"A perjury conviction must rest on the utterance by the accused of a false statement; it may not stand on a particular interpretation that a questioner places upon an answer." *Id.* at 374 (citing

*Bronston v. United States*, 409 U.S. 352, 360 (1973)).  "The Supreme Court instructs 'that any special problems arising from the literally true but unresponsive answer are to be remedied through the 'questioner's acuity' and not by a federal perjury prosecution.'"  *Id.* (citing *Bronston*, 409 U.S. at 362.  "The burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry." *Bronston*, 409 U.S. at 360.  "The defense applies solely to those cases where a defendant's testimony is literally truthful–even if unresponsive." *Lighte*, 782 F.2d at 374 (citing *Bronston*, 409 U.S. at 360).

Count I

Count I relates to conversations that occurred on June 21, 1995 among Asandrov, Donna Miceli and Fred Terrigino, an IRS Appeals Officer, at Terrigino's office in Rochester, New York. The conference was held, at the request of Terrigino, to further discuss a petition for relief from tax liability filed by Asandrov on Donna Miceli's behalf.

Donna Miceli and her husband had received a Notice of Deficiency for approximately $88,000 relating to their joint personal federal income tax returns for tax years 1981-1986.[2] Asandrov represented Donna Miceli concerning the tax deficiency.  He had filed a petition in the United States Tax Court claiming errors in the deficiency notice.  He also requested that Miceli receive "innocent spouse relief" (Ex. 60B), pursuant to a particular section of the Internal Revenue Code, 26 U.S.C. § 6013(e).  If granted, such a determination would free Donna Miceli from liability for the tax deficiency.

---

[2] 1983 was not an issue.  The Micelis received a tax refund that year.

Section 6013(e), as it existed prior to enactment of an amended version in 1998,[3] provided that a spouse who had executed a joint return could be relieved of liability for tax if she/he established that she/he did not know of the understatement of income and that it would be "inequitable" to hold her/him liable for the deficiency, under all the circumstances.

After Asandrov had filed the petition for relief in the Tax Court, the matter was assigned to Terrigino. It was his responsibility to handle taxpayer appeals from adverse rulings by revenue officers. He was assigned the case involving Donna Miceli on or about February 17, 1995. He had no prior contact with the Micelis, but he knew Asandrov because he had been involved in several prior cases with him.

Terrigino testified that he first met with Asandrov on April 13, 1995. Terrigino recalled Asandrov telling him that Donna Miceli was a "poor soul" who was in financial distress, had marital difficulties with her husband, and that she would be a prime candidate for innocent-spouse consideration. Terrigino recalled that the two agreed to deal with the innocent-spouse issue first and delay considering some of the other tax issues because they might become moot if the innocent-spouse defense applied. Terrigino testified that at the April 13 meeting, he requested a conference with the taxpayer and Asandrov. Asandrov agreed to provide information to Terrigino at or before their meeting.

---

[3]"Relief under the former innocent spouse statute, § 6013(e), was difficult to obtain, so Congress repealed § 6013(e) and enacted a new provision, § 6015, in 1998. See S.Rep. No. 105-174, at 55 (1998); H.R.Rep. No. 105-364(I), at 61 (1998). New § 6015(b)(1) provides similar relief to that available under former § 6013(e). New § 6015(c) and (f), however, are new forms of relief." *Cheshire v. C.I.R.*, 282 F.3d 326, 332 n. 9 (5th Cir. 2002).

The crucial meeting occurred on June 21, 1995 at Terrigino's office at 255 East Avenue, Rochester, New York.  The taxpayer, Donna Miceli, Asandrov and Terrigino were the only three persons present.  There was no transcript or tape recording of the meeting.

Terrigino testified that he interviewed Miceli and discussed her economic circumstances. In considering whether to grant innocent-spouse relief, Terrigino needed to consider many factors, including Donna Miceli's relationship with her estranged husband, their economic circumstances, whether Donna Miceli benefitted from the tax fraud, and all of the circumstances of the case.  In addition, Terrigino was aware that  Donna  Miceli had had an affair with another IRS agent, which had become public and was of considerable embarrassment to the IRS. Also, it appears that Donna Miceli had supplied information to the IRS about her estranged husband's tax fraud.

Terrigino testified that he recalled asking Miceli if she had any assets.  He claimed that Miceli answered "that she had a condo."  Miceli told Terrigino that the money to purchase the condo came from her mother-in-law, who had been providing support for the couple.  It is this conversation that forms the basis of the perjury count against Asandrov in Count I.  As noted above, and in the indictment, Asandrov answered "No" when asked at trial whether Terrigino asked questions directly of Donna Miceli about her assets during the June 21 meeting.

I have a doubt -- a reasonable doubt -- on this Count.  This doubt  is based on several factors, most of which relate to the nature of Terrigino's testimony.

The Government's proof that this conversation occurred between Asandrov and Terrigino on June 21 rests entirely on the testimony of Terrigino.  Donna Miceli was not called as a witness.

The first problem is that the alleged discussion of assets, and particularly Donna Miceli's claimed ownership of a condominium, was never documented in any of Terrigino's notes or files. Terrigino was questioned extensively about his Case Management Activity Record (Ex. 61) ("activity log") that he maintained on the case. Terrigino's notes about the June 21, 1995 conference only contains the following:

> Conference held POA & T/P-T/P interview - information requested on her finances & gift from mother-in-law.[4]

If Donna Miceli disclosed ownership of only one asset -- the condominium -- it seems somewhat unusual that there was no notation of it in any of Terrigino's notes. Terrigino conceded that he had no other notes concerning the matter and his contemporaneous notes would have been destroyed, as was customary, when the case was closed.

The activity log itself is grossly inaccurate concerning the time spent on each occurrence. For example, Terrigino listed 8 hours for the meeting with Asandrov on April 13, 1995 and 5 hours for the conference on June 21, 1995. These times are clearly inaccurate and Terrigino conceded that they were incorrect. Terrigino said that although the activity log showed the April 13 meeting as consuming 8 hours, it only took 1 hour. Other times were grossly inflated as well. An August 3, 1995 telephone conference with Asandrov was listed as taking 4 hours when in fact it last only a few minutes. Virtually all of the time notations are grossly inflated. Terrigino never adequately explained why that was done except to say that the times listed were for "time-tracking" purposes. He did concede, at least, that a supervisor noted on the log that the time did seem excessive. I find

---

[4] It appears from the testimony that "POA" refers to a person with a power of attorney, in this case, Asandrov and "T/P" signifies the taxpayer.

Terrigino's explanation concerning these false time notations to be suspect and it undercuts the accuracy of the entire document and of Terrigino's testimony.

Pursuant to the June 21 meeting, Asandrov did supply Terrigino with an affidavit from Donna Miceli's mother-in-law, Teresa Miceli, concerning her financial support of her son and daughter-in-law.  Teresa Miceli's affidavit, received September 13, 1995 by Terrigino (Ex. 62A), describes in three pages her own considerable financial resources.  She also states that she had made "intermittent loans" to her son in the amount of $255,000 to ease them through both financial and marital difficulties.  Teresa Miceli indicated in the affidavit that she had assisted Donna Miceli in the purchase of a condominium and that this was done to ease the discord between her son and daughter-in-law and was a benefit to the grandchildren.

This affidavit was accepted by Terrigino and he took no further action to verify the information or to seek more information from either Donna Miceli or Teresa Miceli concerning the condominium. In fact, Terrigino did nothing further concerning Donna Miceli's assets.  He requested no further information about the condominium, never requested her to provide a list of assets, and did not require a financial net worth statement.  Furthermore, it is clear that Terrigino had no further substantive talks with either Donna Miceli or Teresa Miceli concerning the innocent-spouse matter.

Rather, Terrigino submitted a recommendation to the Internal Revenue Service that Donna Miceli receive innocent-spouse relief under § 6013(e).  (Ex. 62E).  Based on that submission, Donna Miceli did receive favorable treatment and received the innocent-spouse relief, as memorialized in a stipulation and decision filed March 5, 1996 (Ex. 60E).

Although Terrigino did claim to recall the conversation with Donna Miceli on June 21, he was very vague as to what occurred on other occasions and he admitted that he did not recall specifically everything that was said or discussed at that meeting.  (T. 130).[5]  He did recall that Donna Miceli was upset and crying at the meeting.

Terrigino also did not recall the substance of other conversations that occurred at about the same time.  For example, the activity log reflects that on April 5, 1995, he spent 5 hours discussing the case with IRS Agent James Donovan and Agent Gregory Graham, but he admitted that he had no recollection as to the precise time spent with the agents or to anything that was discussed. Similarly, the activity log for April 12, 1995 notes that he spent 4 hours in preparation for the conference on April 13, but he conceded that he had no recollection as to what he did to prepare for the conference on that day.

Although Terrigino was vague and did not remember other details about the case, he stuck to his story that there was discussion about Donna Miceli's assets on June 21.  But, whether she had a condominium or not, apparently would not have necessarily defeated her application for the innocent-spouse exemption.  Whether she owned an asset or not would not defeat the application as long as she met all the criteria under § 6013(e).  Terrigino conceded that fact.  The fact that this condominium did not have much significance is corroborated by the fact that Terrigino never pursued the issue even after receiving the Teresa Miceli affidavit.

As mentioned, the Government's case on Count I stands or falls on the testimony of Terrigino.  There are just too many inconsistencies and problems with his testimony to find -- beyond

---

[5]"T." signifies the transcripts of the trial to the Court on the instant perjury indictment.

a reasonable doubt -- that Terrigino did in fact ask Donna Miceli directly about her assets.  I have a doubt about whether the question was asked at all.  If there was some reference to assets, I am not convinced that it was posed to Donna Miceli as opposed to Asandrov.  In addition, I find it plausible that since the condominium had been disclosed, that Terrigino focused on that and requested some verification of the mother-in-law's gift.  In fact, that item *was* specifically noted in Terrigino's activity log.  So, even if the condominium had been discussed, that is not the same as agreeing that Donna Miceli was questioned about all her other assets.  Terrigino, in sum, was not the best witness.  His poor note taking and lack of recollection concerning the rest of what occurred relating to these matters, a decade ago, give me pause and create a doubt.  Therefore, I must and do hereby find defendant not guilty on Count I.

## Count II

Count II charges Asandrov with giving false testimony at the Miceli trial when he said he did not "review" the Teresa Miceli affidavit (Ex. 62A) with Donna Miceli prior to its being submitted to Fred Terrigino.  To establish its case, the Government must prove that Asandrov did what he denied doing, that is, review the Teresa Miceli affidavit with Donna Miceli *prior* to its submission.  In my view, the Government has failed to carry its burden of persuasion by proof beyond a reasonable doubt on this issue.

The Government had no direct evidence that *prior* to the affidavit's submission, Asandrov had reviewed its contents with Donna Miceli.  Perforce, it must rely on circumstantial evidence to establish this fact.  The Government relies on billing records and facsimiles sent to the Micelis to

establish that Asandrov did in fact review the Teresa Miceli affidavit with Donna Miceli.  The proof does not support such a finding.

John Bansbach, Esq. testified that he was one of the founding partners of the Bansbach, Zoghlin law firm in Rochester, New York.  Asandrov worked at the firm from 1991 to 1996.

Bansbach described how contemporary time sheets were prepared by the attorneys and then later entered into the firm's database, by others, in order to generate bills for clients, etc.  He identified Exhibit 180 as the computer printout of the time sheets generated by Asandrov on the Miceli tax file.  Bansbach testified that the original hand-written time sheets no longer existed and had probably been destroyed long ago.

These computer printouts and bills do little to establish the Government's case by proof beyond a reasonable doubt.  First of all, there is no computer printout or bill that specifically states that Asandrov reviewed the Teresa Miceli affidavit with Donna Miceli or anyone else.  The computer records are not helpful.  They often describe the "client" as both Donna and Samuel Miceli.

Exhibit 177 consisted of a compilation of bills submitted to the Micelis for legal work performed.  It is hard to determine to whom Asandrov spoke and dealt with on the matters at issue. For example, a billing reference at # 08 on September 22, 1994 describes a telephone conference "with client" regarding petition for spouse.  On the line utilized to describe the client, both Donna Miceli and Samuel Miceli are listed.  Based on this record, it is impossible to determine to whom Asandrov spoke.  Another exhibit at Ref. #60 on August 3, 1995 (Ex. 180) refers to a telephone conference with "client" about resolution of a matter "with affidavit."  Once again, though, the client

is listed as both Donna Miceli and Sam Miceli.  There is no further reference as to whom Asandrov spoke.

There are some references that do indicate that Asandrov had conversations with Sam Miceli or with Donna Miceli, but they do not show that Asandrov *reviewed* the Teresa Miceli affidavit with Donna Miceli before its submission.  Most of the entries suggest that Asandrov was conferring with *Samuel* Miceli and not Donna Miceli about his mother's affidavit.  For example, on August 8, 1995, at Ref. #61 (Ex. 180), there is a notation that Asandrov had a telephone conference with Sam Miceli and "discussed mother's affidavit and F. Terrigino indication . . . ."  No mention is made of any conversation with Donna Miceli.

A few weeks later, there is another notation at Ref. #69, on September 5, 1995.  Here the entry is "telephone conference with S. Miceli concerning corroboration of loans from mother . . . ." "S. Miceli" is obviously Sam and not Donna Miceli.

A week later, on September 11, 1995, two days before the Teresa Miceli affidavit was submitted, the billing database, at Ref. #70, shows "telephone conference with S. Miceli about affidavit particulars . . . ."  Again, no reference at all to Donna Miceli.

Another telephone conference was apparently conducted on the same day with Sam Miceli (Ref. #82) "about revision, facsimile, promissory note, cancelled check."  Again, there is no mention of Donna Miceli.

There were two notes in the database during this period that do reference Donna Miceli.  One is Ref. #75, on September 8.  It notes an entry on the time sheet of 15 minutes for a telephone

conference with Donna Miceli "concerning affidavit facts."[6]  On September 11, the same day several

calls had been placed to Sam Miceli, there is a reference at #78, to a 15 minute telephone conference

with Donna Miceli "about corroborating checks, loans, bonds, etc." But, neither reference in the

database indicates that any "review" of the completed affidavit took place.  The reference on

September 11 does not even mention the affidavit and even the reference on September 8 just

discusses the "affidavit facts" which apparently included the retainer agreement that still remained

unsigned.  It is just too speculative from these two meager references to conclude that Asandrov did

in fact review Teresa Miceli's affidavit with Donna Miceli before it was submitted to Terrigino.

There are two facsimile transmission cover sheets that the Government suggests are germane.

Neither, though, is conclusive on the issues at hand.  The first is Ex. 175, dated September 11, 1995

and directed to "Sam and Donna."  It purports to enclose an "updated affidavit" and the sender,

Asandrov, urges the Micelis to sign the firm's retainer agreement.  Unlike another facsimile sent two

days later, Ex. 173, this document has no receipt or other notation that the fax was ever in fact sent.

Bansbach had no proof or other evidence that this document was ever sent via facsimile.

The facsimile dated September 13, 1995 (Ex. 173) does show a receipt that it was sent to

"Sam and Donna Miceli."  In that cover sheet, Asandrov again prompts the clients to sign off on the

retainer agreement and indicates that he will not file "the affidavit" without it.  He also requested the

Micelis to return, by facsimile, the backside of a particular check for submission.

---

[6]I assume that the actual conversation could have been far less than 15 minutes in length since the minimum
time-period for billing appears to be 25% of an hour or 15 minutes.

In sum, I conclude that none of this evidence conclusively shows that Asandrov reviewed the Teresa Miceli affidavit with Donna Miceli prior to its submission on September 13, 1995.  First of all, it is questionable whether just sending the affidavit to both Samuel and Donna constitutes a "review" of the document.  That is what Asandrov was asked at the Miceli trial, that is, whether he had "reviewed the affidavit" with Donna Miceli.  If he reviewed the affidavit with Samuel Miceli or Teresa Miceli, such activity does not constitute reviewing it with Donna Miceli.

The evidence is just not sufficient to establish, by proof beyond a reasonable doubt, that Asandrov did review the Teresa Miceli affidavit with Donna Miceli. It appears that the bulk of the activity on this matter was between Sam Miceli and Asandrov.  The copies of bills submitted to the clients (Ex. 177) virtually all reference activity with Samuel Miceli, not Donna.  After all, it was not Donna Miceli's affidavit.  Prior to Teresa Miceli signing the affidavit, it would be routine to discuss its contents with the affiant, but there is no reason to review the affidavit with non-signatories.

Furthermore, there is no evidence that Donna Miceli was present when Teresa Miceli signed the affidavit before Asandrov.  Asandrov testified before this Court that Samuel Miceli brought Teresa Miceli to Asandrov's office to sign her affidavit.  Teresa Miceli was not there.  (T. 618-19).

I find that the Government has failed to convince me by a proof beyond a reasonable doubt on this Count.  Assumptions, guesses and speculation are not permissible in a criminal prosecution, and this is especially so in a prosecution for perjury. In reversing a perjury conviction, Chief Justice Warren Burger noted for the court in *Bronston*, 409 U.S. at 360 that "the perjury statute is not to be loosely construed . . .."  With that guidance, I must find defendant **NOT GUILTY** on this count.

Count III

Count III, at specification 18(a), charges Asandrov with false testimony at the Miceli trial when he denied stating to Agent James Donovan on May 13, 1998 that he, Asandrov, had reviewed the Teresa Miceli affidavit with Donna Miceli.  Both Assistant United States Attorney ("AUSA") Richard Resnick, who prosecuted the Micelis and questioned Asandrov at that trial, and Agent Donovan testified for the Government about what occurred at the May 13, 1998 meeting.  The defendant testified as well.

At the Miceli trial, Asandrov denied reviewing the Teresa Miceli affidavit with Donna Miceli prior to its submission. During cross-examination, AUSA Resnick questioned Asandrov, as indicated in the specification that forms the basis for the perjury allegation in Count III.  In response to Resnick's question, Asandrov denied telling Donovan at the May 13, 1998 meeting that he had reviewed the Teresa Miceli affidavit with Donna Miceli.

At this trial on the perjury charges, both Resnick and Donovan testified about Asandrov's alleged statement on May 13, 1998.  Resnick had contacted Asandrov and asked him to meet with the prosecutor at the U.S. Attorney's Office to discuss certain inconsistencies relating to Donna Miceli's finances.  Agent Donovan attended the meeting and took some contemporaneous notes while Resnick and Asandrov discussed the matter.   Donovan testified that he did not have a clear recollection as to what occurred back on May 13, 1998, and so the Government moved, and the Court accepted, Donovan's "Memorandum of Interview" (Ex. 185) as a past recollection recorded. (Fed. R. Evid. 803(5)).  Only paragraphs 1, 2 and 5 were received as germane to the instant prosecution.  In his Memorandum of Interview, Donovan recorded the following:

>Asandrov stated that when he prepared and reviewed this affidavit
>with Donna Miceli and provided it to Appeals Officer Fred Terrigino
>he believed that she was entitled to innocent spouse.

(Ex. 185, p. 1). The affidavit referenced was the Teresa Miceli affidavit (Ex. 62A) that was submitted to Terrigino on September 13, 1995.

Donovan prepared contemporaneous notes (Ex. 185A) during the meeting with Asandrov and Resnick on May 13, 1998, and they were received into evidence. Donovan was cross-examined extensively about those notes. Several points were made. Perhaps the most important was that although Donovan wrote what he believed were "important" details about the May 13 meeting in his contemporaneous notes, there was no reference in the notes to the fact that Asandrov stated that he had reviewed the Teresa Miceli affidavit with Donna Miceli. There was no notation that Asandrov had reviewed the Teresa Miceli affidavit with Donna Miceli *prior* to its submission to Terrigino.

There is a reference in Donovan's notes (Ex. 185A, p. 3) that "affidavit reviewed by DM/LA thought it was correct at that time." [DM is Donna Miceli and LA refers to Louis Asandrov). But Donovan conceded that he did not know whether Donna Miceli reviewed the affidavit by herself or with her husband or with Asandrov, and he did not know whether this review by Donna Miceli, of whatever nature, occurred before or after the document had been submitted to Terrigino.

Donovan conceded that his contemporary notes did not contain any statement that Asandrov personally reviewed the affidavit with Donna Miceli. In other words, the contemporaneous notes are not clear as to whether Donna Miceli reviewed the affidavit with or without the assistance of Asandrov, and there is no clarification as to when this review took place.

Furthermore, Donovan admitted during cross-examination that some of the words and phrases used in his Memorandum of Interview were not a verbatim report of what Asandrov actually said, but was Donovan's "interpretation" of Asandrov's statement.  It is clear that Donovan never quoted Asandrov directly in his Memorandum of Interview.   (Ex. 185).

At the Miceli trial, Asandrov testified that he had prepared the Teresa Miceli affidavit and that although he obtained some financial information from Donna Miceli, most of the financial information was obtained from Samuel Miceli. (Ex. 188, p. 582-583 [excerpt of Louis Asandrov testimony at Miceli trial]).  In the instant trial, Asandrov testified and denied that he reviewed the Teresa Miceli affidavit, and he denied saying that he did so during the May 13, 1998 meeting with Resnick and Donovan.

Asandrov stated that when Resnick confronted him at that meeting with the Teresa Miceli affidavit and implied that he had done something wrong which could jeopardize his license to practice law, Asandrov replied in what he described as an "knee jerk" reaction, in an attempt to convince the prosecutor that he had not intentionally done anything wrong, that Donna Miceli had reviewed the affidavit and that he, Asandrov, assumed that it was legitimate.  What he meant was that he assumed that Donna Miceli would have reviewed the affidavit at some time during all these proceedings but he, Asandrov, never reviewed it with her, either before or after it had been submitted to Terrigino. Asandrov also insisted that he *never* spoke to Donovan at the May 13 meeting.  Resnick was the interrogator and Asandrov replied to him.  Donovan asked no questions of Asandrov at that meeting.

There are several reasons why I believe that the Government has failed to carry its burden of proof on this count.  First of all, leaving aside the substance of what was said by Asandrov on May 13, 1998, I find that Asandrov's statement was literally true, that is, he did not tell *Donovan* anything; his response was to *Resnick*.  The Government, in its closing argument, suggested that such an interpretation was hyper-technical.  I disagree.

In retrospect, the question posed was not as precise as it could have been. The prosecutor did not ask whether Asandrov had told the prosecutor about reviewing the affidavit or whether Asandrov had told the prosecutor this in the presence of Donovan.  The question was, "didn't you tell Agent Donovan about the affidavit?"  In some respect, the question was ambiguous.  It required defendant to acknowledge two things:  the substance of what was said and the person to whom the statement was addressed.  According to all the participants at the May 13 meeting, Donovan did not ask Asandrov any questions.  Therefore, it was not an unreasonable response for Asandrov to state, "no", he did not speak to Donovan and tell him about the affidavit.

The question was posed in such a way as to be fundamentally ambiguous, which I believe preclude a conviction for perjury.  Questions that suggest fundamental ambiguity about the inquiry preclude a conviction for perjury.  *See United States v. Markiewicz,* 978 F.2d 786, 809 (2d Cir. 1992).

"The purpose of the rule of fundamental ambiguity is three-fold, namely, to (1) preclude convictions grounded on surmise or conjecture; (2) prevent witnesses from unfairly bearing the risks of inadequate examination; and (3) encourage witnesses to testify (or at least not discourage them

from doing so)." *United States v. Farmer*, 137 F.3d 1265, 1269 (10th Cir. 1998) (citing *Bronston*,

409 U.S. at 359).

> Where a question admits of two reasonable interpretations, some evidence must show
> what the question meant to the defendant when [he] answered it.  Otherwise, the
> Government has not provided the jury with enough evidence to conclude beyond a
> reasonable doubt that the defendant knowingly rendered false testimony, as required
> to obtain a conviction under § 1623(a).  While a jury may guess correctly as to a
> defendant's understanding of a question, it is not entitled to guess at all.  The
> evidence must establish the fact.  Nor is a witness required to guess the meaning of
> a question posed to her upon peril of perjury. "Especially in perjury cases,
> defendants may not be assumed into the penitentiary."

*Id.* at 1269-70 (quoting Brumley, 560 F.2d 1268, 1277 (5th Cir. 1977) (other quote and citations

omitted).  *See Farmer*, 137 F.3d at 1270 (evidence did not support conviction for making false

declarations, given government's failure to offer evidence as to what ambiguous question underlying

prosecution meant to defendant when she answered it; defendant reasonably could have understood

prosecutor in the prior proceeding, in asking whether defendant had talked to third party "about your

testimony here today," to mean whether such a conversation had occurred on same day, not whether

such a conversation had occurred prior to her testifying).

When a question is only arguably ambiguous and "'an answer would be true on one

construction of [the] question but false on another' ... the defendant's understanding of the question

is a matter for the jury to decide." *United States v. Bell*, 623 F.2d 1132, 1136 (5th Cir. 1980) (quoting

*United States v. Slawik*, 548 F.2d 75, 86 (3d Cir. 1977)).  Because of the way the question here was

posed, Asandrov could have answered the question truthfully as he interpreted it.  He made no

statements to Donovan.  As he understood the question, that was literally true.  He spoke only to

Resnick.

This may seem hyper-technical to some, but courts, including the Supreme Court, have recognized the perils of perjury prosecutions and the need to be precise so that no one is convicted based on ambiguity or confusion as to what was intended.

For these reasons, I find the defendant **NOT GUILTY** on Count III.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge


Dated: Rochester, New York
       October 6, 2005.